The next case for argument is 25-1244, Loveridge v. United States. Are you ready now, Mr. Stewart? Yeah, may it please the Court, Your Honor. This case should have actually been a very simple and straightforward rails-to-trails valuation trial. It was unnecessarily and incorrectly complicated by the CFC's ruling in Loveridge 6 that OCSR's continuing operation in the before condition had to be considered by the appraisers. Three years before Loveridge 6, in Loveridge 4, Judge Firestone, before she passed away, rendered an opinion that it should be unencumbered in the before condition. And Loveridge 6, and then obviously carried over to Loveridge 7, repudiated that correct decision from Judge Firestone. Loveridge 4 was correct because there is no question that all, and I mean all, prior precedent in rails-to-trails cases is unencumbered in the before if the deeds are limited to railroad purposes. Why is that? Because trail use is beyond the scope of a railroad purposes easement. What about railroad use? Here it's not trail use, it's railroad use. Pardon me? Here it's not trail use, it's railroad use. That's why Toscano is a perfect roadmap, Your Honor, for that. Toscano holds that there was an attempt to divide the easement into passenger service and freight service, and the CFC said that there is only one easement. And although the railroad can lease that out or sell that use, it still has to be a railroad purpose. And so that's exactly what OCSR is in this case, is a railroad purpose under and totally derivative from POTB's easement. And since there was only one easement in Toscano, the CFC ruled that trail use is inconsistent with that railroad purposes easement, and that entire easement was extinguished for purposes of valuation. That is actually promising. Those are both federal easements, right? Federal railroad uses? Not the state one we have here. Yes, Your Honor, that's correct. Doesn't that make a difference? It actually does not make a difference because if you go back in time to PRESO 2 and every case that's ever been decided on rails-to-trails valuations, it's unencumbered in the before if the railroad purposes easements, or if the easements are limited to railroad purposes. Why? Because of PRONG 2 of PRESO 2. This case is very unique. I've never seen a case that involves a easement for interstate only railroad use, which the federal government doesn't have anything to do with. That's Toscano, Your Honor. No, it's not. I thought you said that Toscano involved passenger and freight, but they were both federal. No, they were not both federal. It was interstate passenger use in Utah in Toscano. It was a state easement? It was a state easement. And it's not under the jurisdiction of the STB. That's the whole point. In this case, when we talk about federal jurisdiction and we're talking about it in the context of OCSR's use, that's the point that the government is trying to make, that there is no federal jurisdiction at that point. So, therefore, the easement is not abandoned under state law. So, just to clarify, I mean, Toscano that you're relying on, that's a court of federal jurisdiction? Yes, Your Honor. Okay, so we're not bound by it, right? I'm just throwing that out there and getting confirmation from you. I want to make sure I'm not missing anything. You are correct, Your Honor. I know of no case where this issue has come before this court before. The reality is, though, is that it's been such well-settled law ever since PRESO 2 was decided that it's unencumbered in the before in every case, literally. I hear you, except most every case doesn't involve the state easement for, you know, a train, you know. So, but is Toscano the only case that would then involve this peculiar fact situation or do you know of others? The only case that I'm aware of that involves this fact situation.  So, let me turn to, if you conclude that it's not unencumbered in the before condition, and we turn to the state use. I think this is a fascinating academic question. If it's not unencumbered in the before, what is it? And here, it's actually the CSC and the government don't even agree. The CSC says that the freight easement is gone, confirming liability. So, at least a large part of the scope of that easement is gone, but that OCSR is still using it. In fact, the CSC was hung up on the fact that OCSR was still using it and even actually accused both parties of hiding the fact that we didn't tell Judge Firestone about OCSR in the before. But the major error that the CFC made is, when it reached its decision, it made no comment whatsoever, let alone findings defining what OCSR's legal rights were in the before. The government takes a totally different approach. They say that they confirm liability, but then they say the POTB's easement still exists, even though the freight easement is abandoned for liability purposes. And that OCSR's continuing use has to be considered in the valuation phase. So, this is where we get to the state use by OCSR. First, you have to remember that liability has nonetheless been established, and there is no federal continuing jurisdiction at that point. And the government spends many pages in their brief saying, at that point in time, POTB's easement is not abandoned under state law. And we totally disagree with that because we believe it should be unencumbered in the before. But if you'll indulge me for a minute, I want to talk a minute about that state use, because the government is completely wrong on what that means. Here, the uses that are being allowed by OCSR, by POTB, do not encompass the entire 100 feet. They encompass the 17 feet. And under state law, if OCSR is using it for that purpose, then it also allows other non-interfering uses. That's what the government says. And in this case, there are a number of other non-interfering uses, including all of the landowner's uses that were incorporated and indoctrinated into the encroachment agreements themselves. So, at that point in time, even if you are under Oregon state law, and it's non-exclusive as the government would have you believe, there are other non-interfering uses allowed. And all of the evidence in this case indicates that it is only approximately 17 feet of that 100 feet easement that OCSR was using. And, in fact, the agreement between POTB and OCSR documents that in their agreement. Exhibit 51 in appendix pages 2132 and 2133, it specifically says that the use by OCSR is exclusive for the 17 feet and non-exclusive for the remainder of the right-of-way. So, at that point in time, all of the evidence in this case demonstrates that OCSR's operation is the definition, or the landowner's use as compared with OCSR's operation is the definition of a non-interfering use. Because all the facts in the record point to OCSR requiring only 17 feet, including the agreement itself between POTB and OCSR. The landowner's encroachment agreements in the before document that fact and document that it wasn't OCSR that was using the entire width of the 100 feet, it was the landowners who were using the rest of the width for that 100 feet as documented in the encroachment agreements. So they were using it for their parking adjacent to Jetty Fishery, for their driveways, and for their houses that encroached on that right-of-way. That's what made the encroachment agreements effective. And in fact, those landowners were entitled to those encroachment agreements both under Oregon law, as set forth by the government, and under the contractual rights themselves. So, if you fast forward, there are only two options here. The first one is that it's unencumbered than before, which we say it should be. But even if you take the government's argument that it's not abandoned under state law, that opens up this realm where OCSR's use continues for the 17 feet, which leaves the remaining 83 feet as unencumbered for valuation purposes. That's exactly, even under the government's theory, where you have to end up. Now, as a result, if we get into this discussion about OCSR, and it's not unencumbered than before, and we get into this discussion about the alternative scenario where you have to consider OCSR's use under state law, that ends up fully supporting plaintiffs' supplemental appraisal reports where they used 17 feet in the before. And that's the bottom line. We have actually proved those damages both ways. We proved damages based on unencumbered than before, and we proved damages based on OCSR's continuing state use at 17 feet. Now, we believe you have to reverse on the before, but it's really clear you have to reverse on the after. The government is maintaining that OCSR is continuing in the after condition. Now, the fact of the matter is, is that every case, just like every case is unencumbered than before, every case that's ever been decided since Preso 2 says that it is an exclusive easement in the after because of the federal jurisdiction. And the important thing is, is that it's exclusive because both the STB and the trail operator can dictate the use of that corridor in the after condition. And the right to exclude flows to the trail operator under the Trails Act. And the intended consequence of that allocation of control is that the landowners have no right to use the encumbered portion of the corridor in the face of any conflicting position taken by either the STB or the trail operator. Now, in this case, what's really interesting is the CFC ultimately acknowledged that plaintiffs have definitively lost property rights. And yet he didn't make, the judge made no attempt to quantify what those rights were. That simply must lead to the just compensation equal to the full market value of appellants taking land and improvements as of the need to date. Now, we believe Agapian provides the perfect roadmap for that. It's not a federal circuit opinion. It was not appealed by the government. And it shows that it's exclusive in the after condition and went through each one of these elements. There's also another case, Cheshire Hunt, which is also not this court, but we cited in our brief, where they specifically says the taking is the entire width of the corridor. And the need to says that, and there must be a common sense understanding that an easement holder may use the entirety of the burdened property for the purpose of the easement. Just like in the before, where every case is unencumbered in the before up to now, in the after, every case is exclusive in the after, and every case is 100% taken in the after. Now, my time is already running out. I want to talk about damages, so at least I preserved that. The appellants established... They're into your rebuttal time, so quickly. Okay, I'll do it very quickly, Your Honor. The appellants established their entitlement to just compensation for both land and improvements through expert testimony. First, it should have been appraised as unencumbered in the before. The appraisers did that. Second, it should be, if you follow the government's argument, it should be appraised with OCSRs used in the before. We did that too. Frankly, we proved damages both ways. The only difference between Joslin and Jetty Fishery in this case and all other landowners who settled was the existence of the encroachments, and that's why this case went to trial. It's more confusing and distressing and maddening, frankly, use whatever adjective you want, when the CFC said we did not even mention any evidence or present any evidence concerning OCSRs used in the before. And that's exactly what those supplemental reports were. And that's why that evidence, we actually proved our damages both through unencumbered in the before and with the government's argument about using it. Okay, let's hear from the other side. Thank you, Your Honor.  Good morning. May it please the Court, Lee Ann Kim for Applea, the United States. This Court should affirm the Court of Federal Claims' post-trial decision, in which it correctly found that plaintiffs had failed to prove the amount of just compensation with reasonable certainty. The Court of Federal Claims was correct because just compensation must reflect reality, the real conditions as they exist and as they are generally measured by market value. Plaintiffs ignored this reality and presented no market evidence for the specific facts on the ground, though this Court has said and instructed that just compensation must be carefully tailored to the circumstances of each particular case. What about Toscano? Toscano is not relevant to this case, and there are various reasons for that. First, Toscano, although there's been discussion as if Toscano involved an actual passenger local train, it did not include that at all. All Toscano was was a case that involved a piecewise transfer of an easement, where the railroad carrier transferred this passenger portion first, and then later on that was not subject to the STB's jurisdiction because it's a local part of it, and then transferred the federal common carrier part of it later after, and that was the part that was subject to STB approval and then subsequently the need to. But the trial court made a factual finding that both of those transfers would have been needed in order for there to have been ultimately a trail use in that, but for both of those transfers, the land would have reverted back to the landowners unencumbered by the easement. And so, therefore, there was a factual finding in that case that- So you're saying there's a distinction there between that case and this one, because this one, the state easement has been around for a long time. In this case, the railroad was still running and the trial- And there was a separate state easement. There is no separate state easement, to be clear. So I think I want to back up a little bit. Railroad easements exist under state law. They exist because the port, the railroad in this case, their participants gained an interest from the landowners back in 1900, and that railroad easement covers both passenger service and freight service, common carrier service or local service, and all you need is to continue to use that easement for a railroad, any kind of railroad purpose for that to be preserved. And because the evidence at trial showed that the scenic railroad would have continued to run regardless of what the federal action was, what the need to did, it would have preserved that railroad easement and the scenic railroad, even in the before condition. But let me clarify then my question, which is the federal government could not regulate the behavior of the intrastate railroad. That's right. That is the key. That is the key, exactly. And I think I hear you saying that in Toscano, they could. Is that right? It couldn't. It was actually, so what Toscano's, what the trial court did, which again is not precedent, as Your Honor, Judge Sewell recognized, but what it did, the Toscano CFC court, correct, is that they decided that they weren't going to allow this kind of piecemeal transfer of the easement in two parts to kind of be able to fictionalize away the fact that the whole easement was one and that it would have reverted back. There was a factual finding that that whole thing would have gone back to the landowners, would have stopped existing, even if there was only a small piece that, I see that, Your Honor, it looks confused. So the railroad had an easement in Toscano, and it was, again, a broad scope, just like in this case, but the railroad transferred to who was going to be the ultimate trail sponsor, who happened to also be a transit provider as well, a portion that they said is only the passenger portion. It's not that easements can be divided up, but that they were giving the permission to this trail sponsor to use it for passenger service. There was no actual passenger service going on, but because it was only passenger service that was at issue, it was outside the STB's jurisdiction, so they didn't have to go to the STB to say, hey, by the way, we're having this transaction with this entity that's going to allow them to use passenger service. Nothing happened after that. And then the same railroad that has the original easement said, now we're going to go and give you the common carrier part of it, and for that we're going to go to the STB. And the STB gave the permission. And then there was an argument later on that because there had been this segmented transfer that really the need to had only caused the blocking of the very narrow part of it, even though the trial court said that's kind of, this is a fiction, this was a fictionalized transfer of the whole easement done in two pieces, and you can't get around the fact. The trials court didn't let them separate it up for determining the taking. It was all one taking. That's right. But both of them were transferred. But both of them were transferred. Here we have an interstate part that hasn't been transferred at all, and it's still operational. That's right. It's still operational on the original railroad's easement. The original, the port still owns the right-of-way essentially, owns it, parts of it in fee, has some of it in parts of it in easement, is leasing it to the scenic railroad. Can I take you somewhere else? Yes. I was a little confused. The lower court opinion appears to rely on the lack of physical interference eight years after the NITU issued as evidence that supports its condition, its after condition. Don't we look at 2016? Absolutely. So why was he, it's likely harmless error, but was there error in relying on eight years down the road? I think I would focus on the fact that it was harmless error because there was plenty of evidence showing that on the date of the taking, it was known to the public that there was no funding for the trail, the trail plans had not been finalized, and so the actual trail was very uncertain. I think the trial court was very concerned about the complexity of this case and coming out to perhaps the decision he did. So he was, I think, bolstering, not bolstering, but just noting these consistencies after the day of the taking as indicating that there was really no trail, no certainties about the trail ever being built on the day of the taking.  But let me ask you, just as a matter of statute of limitations law, we have a lot of cases with the government historically where if it comes in one time, it's too early, and on the other end, it's too late. Let's assume the government waits more than the statute of limitations. Is it six years? The landowners, you mean? The government waits more than six years? Yeah, the government doesn't start using the easement. I just want to clarify that the government doesn't use the easement generally. It's the trail sponsor and third parties, and it's unclear whether – But let's assume whatever was going to happen didn't happen as of eight years afterwards, according to the trial court. But let's assume it happens, the encroachment happens, after the statute of limitations is run. Does the landowner then get a re-up of the statute of limitations? No, Your Honor. But if it results in a change in value, it's just too late, too bad? That's just generally how just compensation works. When the government takes a property interest, if it does, which is on that date of the taking, here, the need to, under this court's precedent, there's only one date of taking under the Trails Act, and that's the date of the need to, because that's the only time that there's a government action. But that's the – I mean, what I'm concerned about is the second piece of it, which is the evaluation for purposes of statute. Absolutely, and that gets incorporated just by the market understanding what is the – incorporating the future uncertainties into how it's going to value the property on the date of taking. Yeah, but there might be a difference in value between the uncertainty that it may happen in the future and the actual happening of it. There might be two different valuations. So the landowner is just out of luck if that doesn't occur until after the statute of limitations. Yeah, that's the law under the Fifth Amendment, and that is what it is. Supreme Court cases over and over affirm that. The trails – the party licensed to operate the trail, it's a private party, it's not the government, right? That's right. What if they come in years from now and they actually do start operating a trail and tell these people to move their houses and buildings and stuff? That's not – I mean, it's not the government, so it's not a taking. Would they possibly have a cause of action against the trail? That's what we would say. We would say that the plaintiff should be going against – should file something or take up their dispute against the trail sponsor. There's nothing in the Trails Act or in the NITU or anything else that contemplates the idea that there's been an authorization by the government of the taking of the improvements within the rail corridor. What is the response to the argument that even under the government's view of the before condition they proved some amount of damages based on the difference between 17 and 100? That would be – there's an underlying fact-finding there, which is what is the scope of the scenic – the realistic actual reality of the scenic railroads operations. And the court made a fact-finding on that, that it wasn't – it weighed the two arguments. Plaintiffs were arguing that it's limited to 17 feet. The government said it's 100 feet. And it basically made very clear both at APPX Appendix 17 to 18 and Appendix 29 that the evidence did not support plaintiff's position that it was limited to only 17 feet, that, in fact, the scenic railroads operation – The existence of the depot? Was it based on the existence of things like the depot? Yes. It was the depot, the fact that they do maintenance under their contract with the port, which includes – you know, in order to run a railroad, you can't just maintain the tracks. You have to maintain the whole right-of-way. And in addition to that, various other things that they do, like the museums and storing cars and et cetera. And so that is – plaintiffs have not met their burden to show clear error for those factual findings. I will just quickly say that the plaintiffs – or appellants, my friend, in their opening, completely ignored this court's precedent, Rasmussen, which makes clear that in just compensation, going back to my theme about it needs to be based in reality, the before condition has to reflect the state of the property as plaintiffs would have gotten it had it not been for the government action, and they totally ignored that. And they don't explain how their proposed rule that you can always assume that but for the need to, there would be no railroad use when the facts in this case at trial clearly establish that wasn't the case. How they can just ignore that away, somehow it's a matter of law. Thank you. Thank you. We would ask this court to affirm. Your Honor, first of all, in Rasmussen, it's interesting. That was an opinion written by Judge Hughes, and it was actually unencumbered in the before, in Rasmussen. And although they say this is complicated, it's actually very simple. If you follow the government's reasoning, all but 17 feet was unencumbered. That's what's been taken. The court did make a finding of fact that it was 100 feet. That is both a mixed question of law and fact, but that is a clear error because the agreement itself between POTB and OCSR specifically says it's limited to the railroad line itself, and the rest of it is unencumbered. So they took something, and the fact of the matter is what they took at a minimum was all but the 17 feet. This is an unconstitutional windfall to the government. Their right to exclude was taken. The court didn't determine what the calculation of damages should be, and that unconstitutional windfall to the government should be reversed.